626 A.2d 187

**TODAY'S EXPRESS, INC., Mach 1 Personnel, Inc., t/d/b/a Delta Investments, a Pennsylvania General Partnership, Appellants,**

v.

**David M. BARKAN and Gloria Barkan, His Wife, Herbert R. Tauberg and Madelain N. Tauberg, His Wife, and Howard Hanna Company, Appellees.**

Superior Court of Pennsylvania.

Argued April 14, 1993.

Filed June 24, 1993.

Dennis J. Kusturiss, Pittsburgh, for appellants.

Sheldon L. Keyser, Pittsburgh, for Barkan, appellees.

Bradley S. Tupi, Pittsburgh, for Tauberg, appellees.

Anthony Sanchez, Pittsburgh, for Howard Hanna, appellee.

Before WIEAND, POPOVICH and HESTER, JJ.

POPOVICH, Judge:

This case involves an appeal from the order granting a motion for summary judgment against the Plaintiffs/Appellants, Today's Express, Inc., Mach I Personnel, Inc., t/d/b/a Delta Investments. We affirm.

 The standard for assessing the grant of a motion for summary judgment is clear; to-wit:

> In reviewing an entry of summary judgment, this Court may disturb the order of the trial court only where there has been an error of law. This Court applies the same standard as the trial court, affirming a grant of summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In deciding whether summary judgment should have been granted, this Court must examine the record in the light most favorable to the non-moving party.

*Jenkins v. Bolla*, 411 Pa.Super. 119, 600 A.2d 1293, 1295 (1992) (Citations omitted).

 Additionally, the barring effect of the statute of limitations, being a question of law, is properly decided in the context of a motion for summary judgment. *Northampton County Area Community College v. Dow Chemical*, 389 Pa.Super. 11, 566 A.2d 591, 595 (1989).

The facts, viewed in a light most favorable to the non-moving party, indicate that John J. Ghaznavi entered into an agreement with the Defendants/Appellees, David M. Barkan, Gloria Barkan, Herbert R. Tauberg and Madelain N. Tauberg, to purchase a 7–story apartment building (hereinafter referred to as "Lincoln House")[1]; Paragraph 19 of which read:

> 19. **Inspection of Property:** It is hereby understood between the parties hereto that the *Property has been inspected by Buyer or his agent, that the same is being purchased solely in reliance upon such inspection* and that there have not been and are no representations or warranties, expressed or implied, with respect to the physical condition of the Property, made by Seller or Broker except those provid-

---

1. The real estate agent for the sellers/Defendants was co-Defendant Howard Hanna Company.

ed in this Agreement or those set forth in this paragraph: See paragraph 4 of Addendum.

\* \* \*

4. Seller warrants and represents that roof and gutters are in good condition and free of leaks and heating, plumbing and electrical systems are in good operating condition, and all will continue to be in said condition on the closing date. Within thirty days after execution hereof, Buyer shall have the right to inspect the property to determine that all units are in the same general condition as those units which have been inspected, and that the conditon [*sic*] of the building, roof and gutters, and heating, plumbing and electrical systems is satisfactory to Buyer. *Buyer may require that any matters revealed by the inspection be repaired prior to closing, unless Buyer fails to complete the inspection within said thirty day period.* In the event the cost of correcting any matters revealed by the inspection exceeds Twenty Thousand ($20,000) Dollars, Seller shall have the option of correcting such matters or terminating this Agreement. [Emphasis added]

Prior to the closing, Ghaznavi assigned his rights to the Plaintiffs, who were the recipients of the property by deed dated April 2, 1985. Thereafter, the Plaintiffs "discovered" asbestos on the property and, as a consequence, filed a 2-count complaint (grounded in fraud and negligence) on August 28, 1990,[2] averring that the Defendants knew or had reason to know, by the exercise of due diligence and ordinary care, of the asbestos content of the property, that the Plaintiffs purchased the property without knowledge of the asbestos, and that the Defendants had an affirmative duty to disclose the presence of the carcinogen. The failure to act accordingly by the Defendants, asserted the Plaintiffs, constituted fraud in inducing the buyers to purchase and negligence in failing to disclose property contaminated with asbestos.

2. The suit was commenced by praecipe for writ of summons dated May 8, 1990.

Numerous pleadings, answers to interrogatories and depositions preceded the Defendants' presentment of a motion for summary judgment, wherein it was alleged that the Agreement of Sale and Addendum afforded the Plaintiffs the right and the opportunity to inspect the property before the closing. In fact, it was claimed, an inspection of the property was conducted, a report of which was sent by Ghaznavi's attorney to the sellers' attorney pointing out a number of problems. However, none mentioned the presence of asbestos materials on site. Paragraphs 6, 7 & 9.

It was David Gutowski, president of Delta Investments, who "discovered" the asbestos in Lincoln House in December of 1988: It was "open and obvious" in the ceiling of the below-ground garage of the building. Paragraph 15; Gutowski's Deposition, p. 99 (Exhibit # 1).

Of interest to this Court is the remark by the Plaintiffs, appearing in their brief filed in opposition to the Defendants' motion, that: *"The facts as related by the Defendants in their Motion are undisputed."* An attempt to ameliorate this crucial remark was made in the body of the brief and reads:

John Ghaznavi, a naturalized citizen who was born and raised in Iran, testified on pages 96 and 97 of his deposition taken March 13, 1992, that prior to this matter arising, he had *never even heard of the word asbestos.* On page[s] 138 and 139, Mr. Ghaznavi testified that prior to 1988–89 he had no idea that asbestos in a building could be a problem.

In light of the aforesaid, the Plaintiffs aver that, despite the fact that the asbestos was *not* concealed but obvious and open to anyone using the garage facilities, the lack of "some awareness that the condition [wa]s a problem or a potential problem" exonerated them from any duty to exercise due diligence in discovering the asbestos prior to the expiration of the statute of limitations. We disagree.

As a matter of general rule, a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute

suit within the prescribed statutory period. Thus, the statute of limitations begins to run as soon as the right to institute and maintain a suit arises; *lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations* . . .; even though a person may not discover his injury until it is too late to take advantage of the appropriate remedy, this is incident to a law arbitrarily making legal remedies contingent on mere lapse of time. Once the prescribed statutory period has expired, the party is barred from bringing suit unless it is established that an exception to the general rule applies which acts to toll the running of the statute.

The "discovery rule" is such an exception, and arises from the *inability* of the injured, *despite the exercise of due diligence,* to know of the injury or its cause.'

\*　　\*　　\*

*The salient point giving rise to the equitable application of the exception of the discovery rule is the inability, despite the exercise of diligence by the plaintiff, to know of the injury. A court presented with an assertion of applicability of the "discovery rule" must, before applying the exception of the rule, address the ability of the damaged party, exercising reasonable diligence, to ascertain the fact of a cause of action.*

*Pocono International Raceway, Inc. v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (1983) (Emphasis added).

In the case at bar, the Appellants had the means by which to discover the presence of asbestos during the first examination of the property in anticipation of the purchase as early as December of 1984.[3] Thus, the Appellants' attempt to dismiss

---

**3.** This period is the date "inspection" of the property was performed at Ghaznavi's direction by Kelly–Rielly Associates, real estate appraisers and consultants who were members (or candidates) of the American Institute of Realtors. In particular, William W. Rielly was certified under the American Institute of Real Estate Appraiser's *continuing education program.*

Nonetheless, in itemizing the "Construction Details" of the Lincoln House, which included a description of the interior walls and ceilings of

the exposed nature of the asbestos on the basis that neither Ghaznavi nor they were "knowledgeable" of the potential damaging effect of the friable material, or that either one was aware of the existence of public concern over removal of asbestos from commercial property, at the time the 1984 Agreement of Sale and Addendum were executed or the Deed transferring title in February of 1985, is unavailing.

■ The standard by which one's efforts to learn of a cause of action, so as to forestall the running of a statute of limitations, is measured by the *inability*, despite the exercise of diligence, to determine the injury or its cause, not upon a retrospective view of whether the facts were *actually* ascertained within the period. *Pocono*, supra.

■ In applying the *Pocono*-standard *sub judice*, we note that the Plaintiffs' answer to the Defendant–Howard Hanna's request for the production of documents contains an Environmental Protection Agency (EPA) paper captioned: *Guidance for Controlling Asbestos–Containing Materials in Buildings*, which was published in *June of 1985*. Contained therein is reference to asbestos being considered a problem as early as *1985* by the federal government:

## SUMMARY OF GUIDANCE

### INTRODUCTION

*Airborne asbestos contamination in buildings is a significant environmental problem. Various diseases have been linked with industrial exposure to airborne asbestos, and the extensive use of asbestos products in buildings has raised concerns about exposure to asbestos in nonindustrial settings.* Surveys conducted by the Environmental Protection Agency (EPA) estimate that asbestos containing materials can be found in approximately 31,000 schools and 733,000 other public and commercial buildings in this country.

*The presence of asbestos in a building does not mean that the health of building occupants is necessarily endangered.*

the building, *no mention was made of that the fireproof insulation was composed of asbestos.*

As long as asbestos-containing material (ACM) remains in good condition and is not disturbed, exposure is unlikely. When building maintenance, repair, renovation or other activities disturb ACM, or if it is damaged, asbestos fibers are released creating a potential hazard to building occupants. Although not required to do so by federal law, the prudent building owner will take steps to limit building occupants' exposure to airborne asbestos....

\* \* \*

## CHAPTER 1. BACKGROUND ON EXPOSURE TO ASBESTOS INSIDE BUILDINGS

*Construction materials containing asbestos have been used extensively in schools and other buildings.* The concern about exposure to asbestos in these buildings is based on evidence linking various respiratory diseases with occupational exposure in the shipbuilding, mining, milling, and fabricating industries. The presence of asbestos in a building does not mean that the health of building occupants is endangered. If asbestos-containing (ACM) remains in good condition and is unlikely to be disturbed, exposure will be negligible. However, when ACM is damaged or disturbed—for example, by maintenance or repairs conducted without proper controls—asbestos fibers are released. These fibers can create a potential hazard for building occupants.

\* \* \*

### 1.3 Diseases Associated with Exposure to Asbestos

Much of what is known about asbestos-related diseases comes from studying workers in the various asbestos industries. *Exposure to levels of airborne asbestos typical of the asbestos workplace prior to 1972 has been linked with a debilitating lung disease called asbestosis;* a rare cancer of the chest and abdominal lining called mesothelioma; and cancers of the lung, esophagus, stomach, colon, and other organs. *In 1972 federal exposure standards were imposed. The relationship between exposure level and health risk is complex.* The potential for disease appears to be related to

the physical and chemical characteristics of asbestos fibers as well as to the concentration of fibers in the air. Data on asbestos workers indicate that the risks of asbestosis, lung cancer, and mesothelioma decrease in direct proportion to a decrease in total asbestos dose. *Because there is no direct information on health risks from exposure to asbestos in buildings with ACM, the risks are estimated by extrapolation from studies of asbestos industry workers (Nicholson 1984, NRC 1984, The Royal Commission of Ontario 1984).* The estimates indicate that only a small proportion of people exposed to low levels of asbestos will develop asbestos-related diseases. However, combining smoking with occupational exposure to asbestos increases the lung cancer rate above the rate due to either smoking or asbestos exposure only. Also, asbestos exposure in children is of special concern: since they have a greater remaining lifespan than adults, their lifetime risk of developing mesothelioma is greater. *Avoiding unnecessary exposure to asbestos is prudent.*

Pages S–1, 1–1 and 1–2 (Emphasis added).

Interestingly, in the "Reference" portion of the EPA report appears twenty-three (23) source-materials used in the preparation of the study, all but two *pre-date* the 1985 purchase of the Lincoln House.

Albeit neither Ghaznavi nor the Plaintiffs may have had the expertise to detect visually the presence of asbestos or lacked knowledge regarding the deleterious effects of the material in its sedentary state (as was the case here),[4] this does not insulate the Appellants from exercising due diligence to ascertain, if possible, what problems may have existed with the purchase ("structurally") of the commercial realty.

Instantly, as with a medical malpractice suit, the Appellants needed expert advice and counsel to assist them in traversing

4. There appears to be no consensus, at least from our examination of the limited documents of record, that *undisturbed* asbestos is harmful to one's health. See 1985 EPA Report, reproduced in part supra; Defendants' Supplemental Pretrial Statement containing as a "report" Francis W. Weir, Ph.D.'s letter of April 20, 1992.

a

the recently chartered asbestos-field waters and its application to the commercial realty industry. See *Pocono*, supra; 1985 EPA Report, supra; Defendants' Supplemental Pretrial Statement containing as a "report" Francis W. Weir, Ph.D.'s letter of April 20, 1992.

Accordingly, with regard to the aspect of promptness, the essential facts necessary to uncover asbestos were not "impossible" to identify *with the exercise of due diligence.* See *Bickell v. Stein*, 291 Pa.Super. 145, 435 A.2d 610, 613 (1981). This translates into hiring a professional to aid in discovering the presence of a cause of action.

Here, as in *Pocono* and *Bickell*, the Plaintiffs had the ability (by hiring professionals knowledgeable in the field of inquiry, *as they did in December of 1988,*) to ascertain the cause of action and to institute suit within the 2-year statute of limitations (42 Pa.C.A.S. § 5524(7)). The Appellants, having failed to act timely—*5 years after the purchase*—are barred by the statute of limitations from pursuing their suit.

Order affirmed.

WIEAND, J., concurs in the result.